UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                          :
                                          :
                                          :          S1 23 Cr. 134 (VSB)
UNITED STATES OF AMERICA                  :
                                          :
     - v. -                               :
                                          :
BRIAN GILDER,                             :
                                          :
               Defendant.                 :
------------------------------------------------------- x

**DEFENDANT BRIAN GILDER'S SENTENCING MEMORANDUM**

Emil Bove
BLANCHE LAW
99 Wall Street, Suite 4460
New York, NY 10005
Telephone: (212) 716-1250
Emil.Bove@blanchelaw.com

Aaron M. May, *Pro Hac Vice*
HALPERN MAY YBARRA GELBERG LLP
550 S. Hope Street, Suite 2330
Los Angeles, CA 90071
Telephone:  (213) 402-1900
Aaron.may@halpernmay.com

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................................................. 3

II.    BACKGROUND .................................................................................................................... 5

      A.     Mr. Gilder's Personal History ................................................................................ 5

      B.     Mr. Gilder's Closeness to His Family .................................................................... 6

      C.     Mr. Gilder's Commitment to Serving the Community ........................................... 8

      D.     Mr. Gilder's Mental and Emotional Health ......................................................... 10

      E.     Mr. Gilder Accepts Responsibility for His Actions ............................................. 11

III.   THE PSR AND THE USPO'S RECOMMENDATION OF A VARIANCE FROM THE
      ADVISORY GUIDELINES RANGE ................................................................................. 12

IV.    AN AN APPLICATION OF THE RELEVANT 18 U.S.C. § 3553(a) FACTORS SUPPORTS A
      DOWNWARD VARIANCE ............................................................................................. 14

      A.     Nature and Seriousness of the Offense ................................................................ 14

      B.     Mr. Gilder's History and Characteristics ............................................................ 18

      C.     Respect for the Law ............................................................................................. 19

      D.     Just Punishment and Adequate Deterrence .......................................................... 20

V.     CONCLUSION ................................................................................................................... 21

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    PRELIMINARY STATEMENT

The United States Probation Office ("UPSO") recommends that the Court impose a sentence that varies downward from the advisory Guidelines range, observing that Defendant Brian Gilder ("Mr. Gilder") has familial ties and responsibilities despite his "difficult upbringing." (ECF 97 [Sentencing Recommendation] at 41.)  The USPO went on to conclude that Mr. Gilder's "consistent commitment and volunteerism to his community reveals that he can be a caring and generous member of society and is willing to give back to those in need."  (*Id.*)

The USPO's assessment is supported by 51 letters from a cross-section of the community, including Mr. Gilder's family, clients, friends, and people who have benefitted from his dedication to community service and charity.  (*See* Ex. B.)  These letters tell the story of a husband and father to a 16-year-old daughter and 20-year-old son who is "the primary emotional, physical, and financial support system of [his] family."  (ECF 97 [Presentence Investigation Report ("PSR")] ¶ 97.)  They describe a man who has spent nearly every weekend for the past 15 years volunteering to coach sports teams made up of special needs children, and who is the caretaker for his parents and in-laws in addition to his children.  They also show that Mr. Gilder is open, honest, and remorseful about his bad decisions that led to the charges brought against him and that he genuinely regrets his actions and wants to make right.  The letters also speak to the real and serious impact that incarceration would have on Mr. Gilder's family and community.

There are significant mitigating factors in this case that support a downward variance from the advisory Guidelines range.  Mr. Gilder has no criminal history, and he has extraordinary support from the community and his family.  He has committed to working on his emotional health by going to therapy, and to helping others discover the importance of mental health.  Mr. Gilder accepts responsibility for his actions (*see* Ex. A [B. Gilder Letter]) and understands that there will be consequences for what he did.  In the whole scheme of fraudulent activity charged in this case, both the government and the Probation Office agree that Mr. Gilder's role was a minor one.  (PSR ¶ 74.)  Mr. Gilder pled guilty to omitting information about price mark-ups when brokering the

sale of legitimate viatical life insurance policies to professional athletes, as well as assisting in the fraudulent transfer of funds that belonged to Co-Defendant Darryl Cohen's client.  Mr. Gilder is deeply regretful for his role in harming the victims, and has already made all of the restitution and forfeiture payments to make the victims whole financially and thus there is no actual loss in this case.  As a husband and the father of two children who are old enough to understand what their father did, as well as someone who is a caretaker for his parents and in-laws, Mr. Gilder deeply regrets the impact that his actions have had on his family and those in the community who rely on him.

Mr. Gilder, the government, and the USPO all agree that the total offense level for Mr. Gilder is 17 (PSR ¶¶ 5(c), 70-81) and that the advisory sentence range is 24 to 30 months, given Mr. Gilder's lack of criminal history.  (*Id.* ¶¶ 5(c), 84-85.)  In its sentencing recommendation, the USPO has recognized that this is a case that deserves a variance from the strict applications of the Sentencing Guidelines.  (ECF 97 [Sentencing Recommendation] at 40-41.)  In light of Mr. Gilder's lack of criminal history, minor role in a non-violent offense, his "consistent commitment and volunteerism to his community," his "proactive steps to pay the forfeiture and restitution obligations prior to sentencing" and impact to his family, the USPO recommends a sentence of a year and a day.  (*Id.*)

Mr. Gilder is requesting the Court impose a non-custodial sentence, either probation or home confinement, so that he can continue to be there for his extended family and provide for their needs, as well as continue with his community service.  Neither Mr. Gilder nor the community would benefit from his incarceration.  There is no risk he will reoffend, and he has been a model citizen for his entire life with the exception of the instant offense.  Incarceration, on the other hand, would result in great hardship to Mr. Gilder's family, not only to his two children who need him as a father, and his wife who depends on him, but for his parents and in-laws who rely on him for assistance with their medical issues and so much more.

II.     **BACKGROUND**

A.      **Mr. Gilder's Personal History**

Mr. Gilder is a devoted son, husband, father, brother, and son-in-law, and his background shows that the conduct that brings Mr. Gilder before this Court stands in sharp contrast to the other facets of his life.  He is committed to his community, friends, and clients, and those who benefit from his community service rely on him.

Mr. Gilder was born in 1973 in Santa Monica, California to Mark and Judy Gilder, and he grew up in a suburb of Los Angeles with his parents and a younger sister, Jennifer.  (PSR ¶¶ 90-91.)  The family was, and continues to be, close-knit, but Mr. Gilder's "sister's needs consumed his parents' attention, and he was often left to care for himself at a young age."  (PSR ¶ 92.)  Mr. Gilder's father reports that he and Mr. Gilder's mother "were unable to give [Mr. Gilder] the time a child deserves in his upbringing, due to our focus on mental health problems in the family."  (Ex. B at 6 [M. Gilder Letter].)

When Mr. Gilder was in high school, he worked as a camp counselor at a summer camp in Chatsworth with his best friend, Pablo.  (Ex. B at 6 [M. Gilder Letter].)  Pablo started drinking at a party and climbed onto the roof to dance, where he fell through a skylight and died.  (Ex. B at 6 [M. Gilder Letter]; PSR ¶ 107.)  Seeing his close friend's death traumatized Mr. Gilder, and as a result, he volunteered for an organization to curb drunk driving and limits his alcohol intake to this day.  (Ex. B at 6 [M. Gilder Letter]; PSR ¶¶ 107, 110.)

Mr. Gilder graduated from high school and attended college, graduating with a Bachelor of Science degree in Finance.  (PSR ¶ 111.)  Mr. Gilder pursued a career as a financial planner after being taught the importance of saving and investing by his paternal grandfather, with whom he was very close as a child.  (PSR ¶¶ 93, 112.)  Mr. Gilder became a Certified Financial Planner and started his own business as a financial planner.  (PSR ¶ 112.)  In his over 27 years as a financial planner, no one has ever filed a complaint against him or sued him.  (Ex. A [B. Gilder Letter]; Ex B. at 2 [L. Einhorn-Gilder Letter]; PSR ¶ 112.)

Twenty-six years ago, Mr. Gilder met his now-wife, Lisa, who is a part-time independent

music production coordinator.  (Ex. A [B. Gilder Letter]; Ex B. at 1 [L. Einhorn-Gilder Letter]; PSR ¶ 94.)  They dated for four years before getting married in 2001.  (PSR ¶ 94.). In the first few years of their marriage, they struggled to have children and had three miscarriages, the last of which was twins, which devastated them.  (Ex B. at 2 [L. Einhorn-Gilder Letter]; PSR ¶ 94.)  They supported each other through this trauma, and were grateful to eventually be able to have two children, Ryan (age 20) and daughter L. (age 16).  (Ex. A [B. Gilder Letter]; Ex B. at 2 [L. Einhorn Letter]; PSR ¶ 94.)  Mr. Gilder is a "very hands on parent" (PSR ¶ 97), and Lisa observes in the attached letter that "[Mr. Gilder] has always supported me in my career and when I worked late or must be out of town, he would always take care of our children, waking up early to cook breakfast for the kids, feed the dog and take the kids and sometimes the dog to school."  (Ex B. at 1 [L. Einhorn-Gilder Letter].)  Mr. Gilder coached Ryan's Little League baseball teams, and he coached his daughter's basketball team for nine years.  (*Id*.)  Ryan is currently attending college in Nevada, and L. still lives at home.  (PSR ¶ 95.)

The Gilders did not and do not lead a flashy life.  They live in a modest home in the suburbs of Los Angeles, and they save whatever they can for retirement.  Mr. Gilder's father-in-law observed, "[Mr. Gilder] loved simple things and mostly time with the kids.  He never was a bigshot or a showoff, no fancy cars, no mansions, no cruises, no European trips, no designer bags, or jewelry. He just enjoyed being with the family."  (Ex. B at 9 [M. Einhorn Letter].)

Mr. Gilder's Certified Financial Planner status has been suspended and he does not intend to have it reinstated in light of his conviction.  (Ex. A [B. Gilder Letter]; PSR ¶ 112.)  Mr. Gilder has been working as a financial planner for over 27 years, but he has lost many clients due to the ongoing criminal charges.  (Ex. A [B. Gilder Letter].)  However, other clients, even after being informed of his guilty plea, continue to trust and rely on Mr. Gilder to help them with their finances and taxes.  (*See* Ex. B at 49 [C. Inaba Letter].)  Recently, to subsidize his income, Mr. Gilder has been selling baseball and basketball cards.  (Ex. A [B. Gilder Letter]; PSR ¶ 117.)

**B.     Mr. Gilder's Closeness to His Family**

Mr. Gilder's arrest and plea in the present case shocked his family (Ex B. at 2 [L. Einhorn-

Gilder Letter]), and given how much his family relies on him, his removal from their lives for a period of incarceration would be devastating. Mr. Gilder's wife told the USPO that Mr. Gilder "has been the primary emotional, physical, and financial support system of their family." (PSR ¶ 97.) A friend of the family observes in one of the attached letters:

> [Mr. Gilder is] a family man above all. From the moment he and Lisa married through the birth of the kids and all the way through their growing-up, he's been involved in every aspect of their lives. He has always put himself last behind the welfare of his wife and children. He has coached Ryan's sports teams, helps [L.] with homework and preforms all manner of fatherhood duties joyfully.

(Ex. B at 66 [L. Merkel Letter].)

Mr. Gilder's children have been struggling with their father's arrest, and have struggled with "increased anxiety, depression, stress, worry, and confusion regarding [Mr. Gilder's] current situation." (PSR ¶ 95.) A family friend, writes:

> When I first met [L.], she was an insecure young teenager that lacked confidence in herself. As [Mr. Gilder] got her more involved with volunteering and helping the special needs community I witnessed a growth in [L.], not just with her confidence, but also in her self-worth. I fear that without her father to continue to guide her that she will regress to the child she was when I first met her.

(Ex. B at 71 [I. Nelson Letter].) L.'s godfather writes, "[Mr. Gilder's] dedication and love for his daughter, [L.], and son Ryan, are exemplary. He has always shown a deep understanding and patience in his interactions with them both." (Ex. B at 13 [Rabbi Einhorn Letter].) Mr. Gilder's son is in college, and Mr. Gilder still spends as much time with him as he can. (Ex. A [B. Gilder Letter].) Mr. Gilder's daughter is in high school and is experiencing health issues. (*Id*.) Mr. Gilder accompanies her to medical appointments and is trying to her build confidence and handle her anxiety. (*Id*.)

As described above, Mr. Gilder and his wife have gone through devastating losses together, but have also experienced the joys of having children and watching them grow up. (Ex. A [B. Gilder Letter]; Ex B. at 2 [L. Einhorn-Gilder Letter].) They have approached their marriage and parenting as a team, each relying on the other when needed.

Mr. Gilder is also the caretaker for his parents. Mr. Gilder's father has colitis, heart disease, and colon cancer, and his mother has Parkinson's disease and is in remission from breast cancer. Both of Mr. Gilder's parents "have become dependent on him as their health concerns have

worsened over the years." (PSR ¶ 90.) As his parents often cannot drive themselves to medical appointments, Mr. Gilder regularly takes them. (Ex B. at 4 [J. Gilder Letter], 7 [M. Gilder Letter].) Mr. Gilder's parents are not able to rely on Mr. Gilder's sister, as she struggles with mental health issues. (PSR ¶ 91.) Mr. Gilder's father states, "I can't conceive of what we would do without him." (Ex. B at 7 [M. Gilder Letter].)

Mr. Gilder also plays a big role in taking care of his in-laws. Mr. Gilder's mother-in-law has early-state dementia, and after Mr. Gilder's arrest, "all the stress the family was dealing with advanced her disease to the point that she had to be admitted to a memory care facility." (Ex. B at 9 [M. Einhorn Letter].) Mr. Gilder's guilt over this is immense, and he is dedicated to caring for his in-laws. (Ex. B. at 2 [L. Einhorn-Gilder Letter], 9 [M. Einhorn Letter].) Mr. Gilder's father-in-law stated that his love for Mr. Gilder "will never falter." (Ex B. at 9 [M. Einhorn Letter].) Mr. Gilder's wife states that "[she] will never fill his space" if he is incarcerated. (PSR ¶ 97 (alteration in original).)

**C.      Mr. Gilder's Commitment to Serving the Community**

Mr. Gilder views volunteering and community support as an essential part of his life, and he is an essential part of his neighborhood and his community-at-large because of the time he puts into serving his community. In the 51 attached letters, nearly every person mentions something that Mr. Gilder did to support them when they had a need, long before and even after this case came about. As the examples below show, many people rely on Mr. Gilder's time, care, financial generosity and energy.

For the past 15 years, Mr. Gilder has been volunteering as a coach for soccer, basketball, and baseball teams for children with special needs every weekend.[1] (PSR ¶ 114.)

---

[1] A short video about Mr. Gilder's volunteer work with special needs children is available at https://drive.google.com/file/d/1EJL24-8-mUgJ4XKPYlUz9VoYeLLRnE3y/view?usp=drivesdk.



The director of the sports league writes in the attached letter:

> [Mr. Gilder] is one of those wonderful people that has a gift for understanding and appreciating our VIP Players (ALL special needs kids) immediately – he is warm and kind, he talks to the kids, jokes around with them, and encourages the VIP Players at all times (total positive reinforcement) during their soccer and basketball games.  He is also at ease with all of the VIP Players no matter what their special needs diagnoses may be, is equally at ease with the parents of the VIP Players (who are always at the field – ours is not a drop-off sport), is immediately responsive to me if I have questions about the game that day or any particular VIP Player or VIP Players, and it is truly a pleasure to have him as part of our team!

(Ex. B at 11 [K. Henderson Letter].)  Mr. Gilder's love for coaching special needs children has spilled over to his children, both of whom have joined him in volunteering.  (Ex. B at 12 [K. Henderson Letter]; PSR ¶ 114.)  Mr. Gilder is truly passionate about his coaching and is particularly devastated by the possibility that if he were incarcerated, he would be leaving these kids without a coach.  (Ex. A [B. Gilder Letter].)  The director of the sports league is concerned about the possibility of Mr. Gilder being incarcerated as she "desperately need[s]" Mr. Gilder as a coach to help run the special needs programs and because Mr. Gilder "would be truly missed by sooo many of our VIP Players and their families."  (Ex. B at 12 [K. Henderson Letter].)

Mr. Gilder's involvement in and service to his community extends to his neighbors.  For the past five years, he has been walking his 88-year-old neighbor's dog at night because the neighbor is not able to do it himself after his wife passed away.  As the neighbor's daughter, Michelle Halpern, writes in the attached letter, "I honestly don't know what we are going to do if [Mr. Gilder] is not able to help every day."  (Ex. B at 45 [M. Halpern Letter].)  The neighbor, Harvey, writes that Mr. Gilder checks on him at night because his children do not like him living

alone.  (Ex. B at 39 [H. Friedman Letter].)  Mr. Gilder also takes Harvey out to dinner once a month, and Harvey writes, "It is lonely when you live by yourself, and my wife and I had a great marriage for 65 years and [Mr. Gilder] has been a big help to me to keep me busy and looking out for me."  (*Id.*)

Mr. Gilder also uses his financial expertise to give back.  He does pro bono tax and financial planning work for lower income people who need assistance.  The attached letter from a family friend describes how Mr. Gilder stepped in to help his 88-year-old mother file several years of back taxes and refused any payment for his services.  (Ex. B at 85 [K. Vincent Letter].)  Other friends write about the charitable work Mr. Gilder has done for them, be it providing pro bono tax assistance (Ex. B at 30 [L. Curry Letter]), helping with rent when times were tough (Ex. B at 35 [M. Everett-Sanchez Letter]), or taking them to work when their car broke down (Ex. B at 52 [B. Jacobs Letter]).

### D.     Mr. Gilder's Mental and Emotional Health

Mr. Gilder has been in therapy since December 2021 to address depression and anxiety that he has been dealing with relating to his involvement with the activity at issue underlying this case.  (Ex. A [B. Gilder Letter]; Ex. B at 10 [Dr. Calnan Letter]; PSR ¶ 102.)  In particular, Mr. Gilder experienced "nightmares and stress regarding business dealings with [co-defendant] Darryl Cohen and [victim] Chandler Parsons, which had caused him 'a great deal of stress and anxiety and that Chandler Parsons had threatened him with physical harm.'"  (Ex. B at 10 [Dr. Calnan Letter]; PSR ¶ 102.)  Mr. Gilder's therapist determined that he was suffering from PTSD as a result of the threat and that Mr. Gilder "was not merely experiencing anxiety, but was, in fact, having daily panic attacks."  (Ex. B at 10 [Dr. Calnan Letter]; *see also* PSR ¶ 102.)  Mr. Gilder is also being seen and treated by a psychiatrist, who has prescribed him medication for anxiety.  (PSR ¶ 103.)  Mr. Gilder continues to attend weekly therapy sessions.  (Ex. B at 10 [Dr. Calnan Letter].)

Mr. Gilder's experience with therapy has led him to place an increased importance on mental health.  He believes that "'mental health is not discussed enough'" (PSR ¶ 113), and wants to become a mental health coach to help others.  (Ex. A [B. Gilder Letter].)  Last year, he became

certified as a mental health coach and completed several courses related to mental health.  (Ex. A [B. Gilder Letter]; PSR ¶ 113.).  As Mr. Gilder explains in the attached letter, "Moving forward with my life, I would like to share my experience with people and use my mistakes and what I have gone through to teach people they are not alone and help give them solutions to what they are going through."  (Ex. A [B. Gilder Letter].)

### E.   **Mr. Gilder Accepts Responsibility for His Actions**

"[Mr. Gilder] takes full responsibility and apologizes to the victims."  (PSR ¶ 69.)  As Mr. Gilder states in the attached letter, "I don't blame anyone but myself and will suffer the consequences as I deserve."  (Ex. A [B. Gilder Letter].)  He goes on to state, "There is no excuse for what I did and I take full responsibility for my actions."  (*Id*.)

Mr. Gilder feels horribly about the impact his actions have had on the victims of his crime and has done what he could to make them whole.  (Ex. A [B. Gilder Letter].)  Mr. Gilder has already made his agreed-upon forfeiture payment ($257,479.63) as well as the entire amount of the outstanding joint and several restitution payments ($93,125) that remained.[2]  (PSR ¶¶ 139, 141, at 41; Ex. C [B. Gilder Decl.] ¶¶ 2-3.)  Mr. Gilder decided to pay the entire joint and several restitution amount, rather than waiting for his co-defendants to contribute, so that the victims could be made whole now.  (Ex. A [B. Gilder Letter]; ECF 97 [Sentencing Recommendation] at 41.)  With these payments, Mr. Gilder has now forfeited or paid back all of the financial benefit he received from his participation in the scheme, plus an additional $93,125.  (PSR ¶¶ 62-65.).  In other words, in light of the payments Mr. Gilder has made the victims have suffered no actual loss and Mr. Gilder has incurred a financial detriment of $93,125.

Ever since his arrest, Mr. Gilder has felt the impact of his bad decisions.  He is extremely

---

[2] The vast majority of funds from the fraudulent scheme ($3,682,429.25) were never spent and were maintained in a trust account.  (PSR ¶ 23.)  Mr. Gilder agreed to the forfeiture of those funds, and the forfeited funds were used to make the victims whole, leaving an outstanding joint and several restitution amount of $93,125.  (PSR ¶ 64.)  Mr. Gilder sent a check for the $93,125 to Athlete-2 at the address set forth in the PSR on January 2, 2024 and, according to the postal service, the check was received and, according to his bank statement, the funds were withdrawn from his account.  (Ex. C [B. Gilder Decl.] ¶ 3; PSR ¶ 65.)

concerned about the impact that the consequences for his actions will have on his wife, children, and on his parents, for whom he is the primary caretaker.  (Ex. A [B. Gilder Letter].)  A friend of the Gilder family writes that Mr. Gilder "is more concerned with the fact that he has let his family down and perhaps lost their trust. He is deeply aware that should he be incarcerated all the responsibility will fall on Lisa to care for her parents and his father."  (Ex. B at 70-71 [I. Nelson Letter].)

Mr. Gilder has been open with family and friends about the charges brought against him and his decision to plead guilty, as well as his deep regret for his actions and desire to rectify the harm that he has done.  Mr. Gilder's wife writes in the attached letter:

> Brian has always been upfront with me in our marriage and has "expressed his embarrassment, his depression of what will happen with the children and me". He told me he takes full responsibility, and regrets what happened and has no excuses for his actions. He also was upfront with both children, which I know was hard for him, but He told them "We sometimes make bad decisions in life, and we have to take responsibility for our actions."

(Ex. B at 2 [L. Einhorn-Gilder Letter].)  The godfather to Mr. Gilder's daughter, who is also a rabbi, observes:

> I have witnessed [Mr. Gilder's] deep sense of remorse.  It is not just an expression of regret but a profound personal reckoning.  I have seen him take tangible steps towards personal growth, showing a genuine desire to learn from his experiences and better himself, both as a person and as a father.

(Ex. B at 13 [Rabbi Einhorn Letter].)  Mr. Gilder's therapist echoes these sentiments in the attached letter, writing that Mr. Gilder "exhibits a willingness and desire to examine himself, mistakes that he made and accept responsibility for his actions or inactions.  He continues to restore his personal relationships, resume work with teaching and writing and working with people that share his values and morals."  (Ex. B at 10 [Dr. Calnan Letter].)

## III.  THE PSR AND THE USPO'S RECOMMENDATION OF A VARIANCE FROM THE ADVISORY GUIDELINES RANGE

On September 20, 2023 and after several months of negotiation, Mr. Gilder and the government entered into a plea agreement, and on October 12, 2023, Mr. Gilder pled guilty to one count of conspiracy to committee wire fraud in violation of 18 U.S.C. § 371.  (PSR ¶¶ 2, 4.)  On January 5, 2024, the USPO timely filed the final PSR.  (ECF 97.)  Mr. Gilder timely made certain

objections to the initial draft of the PSR, which are accurately reflected in the Addendum to the PSR. (ECF 97 [Addendum] at 33.)

The USPO, the government, and Mr. Gilder all agree that for sentencing purposes, the Guidelines calculations are as follows:

| | | |
|---|---|---|
| Base Offense Level: | 6 | (§ 2B1.1) |
| Amount of Loss (more than $3,500,000): | 18 | (§ 2B1.1(b)(1)(J)) |
| Acceptance of Responsibility: | -3 | (§ 3E1.1(a/b)) |
| Minor Role: | -2 | (§3B1.2(b)) |
| Zero- Point Offender: | -2 | (§4C1.1(a) & (b)) |
| **Total Offense Level:** | **17** | |

(PSR ¶¶ 71-81.)

The PSR provides for a criminal history category of I, which is not in dispute, as Mr. Gilder has no prior criminal history. (PSR ¶¶ 5(b), 82-88.) With a criminal history category of I and a total offense level of 17, the advisory Guidelines range is 24 to 30 months. (PSR ¶ 129.) As explained in its recommendation, the USPO recommends a four-level downward variance from this range, and the imposition of a custodial sentence of 12 months and one day, a fine of $50,000, a special assessment of $100, and a two-year term of supervised release. (ECF 97 [Sentencing Recommendation] at 40.)

In support of its sentencing recommendation, the USPO pointed to Mr. Gilder's "difficult upbringing, familial ties and responsibilities, mental health status, stable employment record, and committed volunteerism." (*Id.* at 41.) The USPO elaborated that Mr. Gilder's "consistent commitment and volunteerism to his community reveals that he can be a caring and generous member of society and is willing to give back to those in need." (*Id.*) The USPO also noted that Mr. Gilder "has taken proactive steps to pay the forfeiture and restitution obligations prior to sentencing . . . to make the victim[s] whole." (*Id.*) Finally, the USPO noted that Mr. Gilder "is the family's main financial contributor and [his] potential incarceration will not only affect him, but also his family members, both financially and emotionally." (*Id.*)

IV.     **AN APPLICATION OF THE RELEVANT 18 U.S.C. § 3553(a) FACTORS SUPPORTS A DOWNWARD VARIANCE**

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).  The Court "may not presume that the Guidelines range is reasonable."  *Peugh v. United States*, 569 U.S. 530, 536 (2013) (citations and internal quotation marks omitted).  Instead, the Court should make "an individualized assessment based on the facts presented" while weighing the § 3553(a) factors.  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Such a process reflects "the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citation and internal quotation marks omitted).  Accordingly, it is "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence," to consider "the fullest information possible concerning the defendant's life and characteristics."  *Id.* (alteration in original) (citation and internal quotation marks omitted).

An application of the sentencing factors to Mr. Gilder's case supports a substantial variance from the Guidelines.[3]  As detailed in the PSR, the mitigating factors in this case are numerous and significant.  Mr. Gilder is a person who has never been in trouble with the law before, and he is a man committed to family and community.  Letters from a cross-section of his life demonstrate that he deeply regrets his conduct and the impact it had on the victims, and that he accepts responsibility for his actions.  Mr. Gilder has already agreed to both forfeiture and restitution amounts, and he has already completed those payments.  In recognition of these facts, a non-custodial sentence of either probation or home confinement is appropriate under section 3553(a).

A.     **Nature and Seriousness of the Offense**

The indictment in this case centers on several schemes perpetrated by Co-Defendant Darryl Cohen, who was a financial advisor at Morgan Stanley for many famous athletes.  Mr. Cohen

---

[3] Mr. Gilder addresses the advisory range above, which accounts for 18 U.S.C. § 3553(a)(4). 18 U.S.C. § 3553(a)(6), the need to avoid unwarranted sentencing disparities, is not relevant at this time, as the other three defendants in this case have not yet been sentenced.

abused his fiduciary duties to his clients in a number of ways, as detailed by the indictment.  As shown by the overview of the offense conduct in the PSR, Mr. Gilder was only involved in a small part of Mr. Cohen's schemes.

Mr. Gilder pled guilty to one count of conspiracy to commit wire fraud based on two of Mr. Cohen's schemes to take advantage of his relationship with his athlete clients.

Viatical Life Insurance Policies

The first scheme related to Mr. Gilder's sale of viatical life insurance policies.  Viatical policies (or "viatical settlements") are a type of investment, defined by Investopedia as "an arrangement in which someone who is terminally or chronically ill sells their life insurance policy at a discount from its face value for ready cash.  In exchange for the cash, the seller of the life insurance policy relinquishes the right to leave the policy's death benefit to a beneficiary of their choice."  *See*  https://www.investopedia.com/terms/v/viaticalsettlement.asp.  "The buyer of a viatical settlement pays the seller a lump sum cash payout and pays all future premiums left on the life insurance policy. The buyer becomes the sole beneficiary and cashes in the full amount of the policy when the original owner dies."  *Id.*  There is a vibrant market for viatical policies, with many companies and individuals who specialize in these products.

Mr. Cohen informed Mr. Gilder that some of his athlete clients wanted to purchase viatical policies.  (PSR ¶ 16.)  Mr. Gilder, who is a licensed insurance broker, bought three policies on the open market through a business entity and then resold them to the athletes as secondary buyers, at a significant mark-up.  (PSR ¶¶ 17-18.)  There is no dispute that these were legitimate policies that, so long as the athletes continued to make the premium payments on the policies, would pay out upon the death of the original owner.[4]

Although Mr. Gilder sold legitimate policies to the athletes, he did not proactively disclose

---

[4] For example, one of the policies Mr. Gilder sold to Athlete-2 turned out to be a tremendous investment.  The policy provided for $15 million in benefits, and the insured individual died two years after Mr. Gilder sold Athlete-2 the policy for $2,550,000.  If Athlete-2 paid the premiums on the policy as he was instructed to do, his total profit on the investment would be over $12 million.

to the athletes that he purchased the policies and resold it to them at a mark-up.  It is important to note that Mr. Gilder did not lie or make any false statements to the athletes.  Rather his involvement in the fraud was an act of omission, the failure to disclose the markup that he and Mr. Cohen were charging.  This fact should distinguish Mr. Gilder from the vast majority of individuals convicted of fraud.   In most fraud cases, defendants lie, mislead, and make other affirmative acts of deception.  That is not the case for Mr. Gilder.

In total, the profit from the sales of the three viatical policies to the athletes was over $4 million.  Mr. Gilder received $257,479.63 from these profits, which he used to pay off the mortgage on his family home.  (PSR ¶ 23.)  Mr. Cohen spent hundreds of thousands of the profits on various items for himself and his girlfriend.  (*Id*.)  Mr. Gilder kept the remaining balance—over $3.6 million—in a trust account, which sat untouched for over three years as he felt uneasy about this money.  (*Id*.)  As part of his plea agreement, Mr. Gilder agreed that the funds held in trust, along with the mortgage payment, should be forfeited so that they can be used to satisfy losses from the offense.  (PSR ¶ 5(c)(v).)  As it turns out, $692,777.36 of these funds were used to help make the victims whole, and the government was the largest beneficiary of the forfeited money, as over $2.7 million of the funds went to the US Treasury.  (PSR ¶ 63.)

Gold Sports Agency

In 2019, Mr. Cohen's client, Chandler Parsons, decided to start a sports agency (Gold Sports Agency) in anticipation of his retirement.  Mr. Parsons was the owner and financier of Gold Sports Agency, but he delegated control over the company to Mr. Cohen and Co-Defendant Charles Briscoe.  (PSR ¶ 33.)  Mr. Gilder provided bookkeeping and other financial services to the company and took direction from Mr. Cohen and Mr. Briscoe.  (*Id*.)

Between approximately November 2019 and May 2020, Mr. Cohen directed Mr. Gilder to wire money from the agency, whose accounts Mr. Gilder had access to as the bookkeeper, to one of Mr. Cohen's other clients, former professional baseball player Nyjer Morgan.  (PSR ¶ 35.)  The purpose of these transactions was to repay Mr. Morgan for loans facilitated by Mr. Cohen as Mr. Morgan's financial advisor that did not turn out well.  (PSR ¶ 38.)  The total of the transfers from

Gold Sports to Mr. Morgan was $93,125. (PSR ¶ 35.) Mr. Gilder followed Mr. Cohen's directions and Mr. Gilder takes responsibility for facilitating the transfers. Mr. Gilder received no benefit from facilitating these transfers.

<u>Loss Amount</u>

Mr. Gilder does not contest any aspect of the Guidelines range, but submits that the loss amount for purposes of the Guidelines range does not reflect the actual harm in this case. As described above, Mr. Gilder has repaid the profits that he made selling the (legitimate) viatical policies to the victims, and the victims stood to make an excellent return on their investment if they maintained the policies. Mr. Gilder has also paid Mr. Chandler for the amount of money that he assisted in transferring from Mr. Chandler to Mr. Morgan.

The loss amount is the biggest driver of Mr. Gilder's total offense level, adding 18 points, but it does not provide a realistic view of the harm caused by Mr. Gilder's actions. *See, e.g.*, *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("[T]he Guidelines would have this court place [defendant] in jail for almost a decade without batting an eyelash simply because of the sizeable profit from the frontrunning trades. The Guidelines do not ask the court to consider the duration of the criminal activity, [defendant's] mens rea, the character of the loss, or any other factors that might allow the court to impose a sentence based on [defendant's] worth.").

There is a "widespread perception that the loss guideline is broken*." United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring). "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). "[W]here, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of

the case and of the human being who will bear the consequences." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).

**B.**     **Mr. Gilder's History and Characteristics**

As described in detail above, Mr. Gilder is a family man, who has two children, one of whom is still in high school, and has been married to his wife since 2001.  He is a "'very hands on parent,'" and has encouraged his daughter to join him in community service.  (PSR ¶ 97, 114.) Mr. Gilder lives near his parents, in-laws, and sister, and is involved in taking care of all of them. He is the primary caretaker for his aging parents who he drives to medical appointments.  He is also an instrumental caretaker for his in-laws.  He is the "primary emotional, physical, and financial support system" of his family.  (PSR ¶ 97.)  His wife told the USPO that if Mr. Gilder is sentenced to a period of incarceration, "'[she] will never fill his space.'"  (*Id*. (alteration in original).)

Mr. Gilder grew up without much time and attention from his parents, who were focused on other members of the family.  In the attached letter, his father recounts a year when the family planned to take Mr. Gilder to a baseball game for his birthday, but had to cancel "due to a medical breakdown involving [Mr. Gilder's aunt]."  (Ex. B at 6 [M. Gilder Letter].)  This was not a unique occurrence as Mr. Gilder was left to fend for himself a lot and he knew he was not a top priority in his family.  (PSR ¶ 92.)

In his adulthood, Mr. Gilder has built a strong community and gives his time, professional knowledge, and energy generously.  He is deeply committed to coaching special needs children, and he is able to connect with his players and their families.  Outside of organized volunteer activities, he has formed close relationships with those around him and does not hesitate to fill the gaps for people when they need it.  Mr. Gilder has submitted 51 letters from members of his community who personally attest to his character and express their support and desire for Mr. Gilder to remain in their lives.

Mr. Gilder feels tremendous distress at the effect that his potential incarceration would have on the people who depend on him.  (Ex. A [B. Gilder Letter].)  The entire weight of caring for their teenage daughter will rest on his wife, who will also need to maintain her part-time job to

support the family.  Additionally, the responsibilities that Mr. Gilder currently shoulders for caring for his parents and his in-laws will land on his wife.  While Mr. Gilder has a sister, she is incapable of playing a role in the care of their parents.  (*See* PSR ¶ 91.)  He is also "desperately need[ed]" to help run the special needs programs he volunteers at every weekend.  (Ex. B at 12 [K. Henderson Letter].)  Mr. Gilder's elderly neighbor, whose dog Mr. Gilder walks every night, will lose an important connection.  Mr. Gilder's sense of responsibility to his community and ability to form close relationships means that there are a lot of people who rely on him.  While Mr. Gilder has accepted that he must bear the punishment handed down from the Court, the impact of a carceral sentence will be broad.

These are all mitigating factors that support a non-custodial sentence.

### C.   Respect for the Law

Prior to this case, Mr. Gilder had never been arrested, charged, or convicted of a crime. Similarly, in his 27 years of business, no one has ever filed a complaint or lawsuit against him. (Ex. A [B. Gilder Letter]; Ex. B at 2 [L. Einhorn-Gilder Letter]; PSR ¶ 112.)  He has also fully complied with all the terms of his pretrial release.  (PSR ¶ 6.)  Mr. Gilder feels great remorse, guilt, and embarrassment over his conduct underlying this case, and he initiated plea negotiations with the government almost immediately after being indicted rather than trying to fight the charges.[5]

Mr. Gilder has been open and honest about this case and his guilty plea.  Mr. Gilder will admit that he has been naïve and susceptible to being blinded by displays of wealth and fame.  In the attached letter, Mr. Gilder states, "I did things that were outside my normal business and have learned a valuable lesson by losing my CFP licenses and trust of the public."  (Ex. A [B. Gilder Letter].)  In the attached letters, Mr. Gilder's friends and family discuss their experience with Mr. Gilder's regret and embarrassment over his actions.  One of Mr. Gilder's clients—who has chosen to continue using Mr. Gilder for financial planning—observed, "I do believe [Mr. Gilder] has truly learned from this situation and is remorseful but also more cautious about who he works with and

---

[5] Mr. Gilder did not know he was under investigation and was never approached by the government prior to being arrested.

trusts."  (Ex. B at 16 [J. Barnes Letter].)

Mr. Gilder's actions that led to this case were wrong, and he knows that.  His respect for the law is only deepened by this case.

### D.    Just Punishment and Adequate Deterrence

A custodial sentence is not necessary in the case to punish Mr. Gilder and deter him from future criminal conduct.  This is Mr. Gilder's first encounter with law enforcement, and his actions were entirely non-violent.  Mr. Gilder's arrest and plea have been nationally reported on by legal publications,[6] and his business and reputation have suffered irreparable harm.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").  "[T]he collateral consequences of a felony conviction form a new civil death," as "[c]onvicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."  *United States v. Nesbeth*, 188 F. Supp. 3d 179, 182 (E.D.N.Y. 2016).

Mr. Gilder is one of the first cohort of defendants to be sentenced after the enactment of the new Zero-Point Offender provisions in the Guidelines.  *See, e.g.,* U.S.S.G. § 4C1.1 and § 5C1.1 App. Note 10.  These new provisions reflect the United States Sentencing Commission 's findings, based upon an extensive review of data, that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders."  Amendments to the Sentencing Guidelines, United States Sentencing Commission, at 79, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.  The Commission further recognizes that in light of these findings, courts should consider non-custodial sentences for non-violent, Zero-Point Offenders.  *See id*.; U.S.S.G. § 5C1.1 App. Note 10.

A non-custodial sentence of home confinement will adequately punish Mr. Gilder while not subjecting his family and community to the deprivation of Mr. Gilder's support and services.

---

[6] *See* https://www.law360.com/articles/1732007/atty-turned-financial-planner-cops-to-scamming-nba-pros.

*See United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (concluding that court can take into consideration as part of 3553(a) factors that defendant was a caretaker for his daughter); *United States v. Prosperi*, 686 F.3d 32, 41 (1st Cir. 2012) (affirming variance and imposition of home confinement where defendant was caretaker for family members); *United States v. King*, 201 F. Supp. 3d 167, 171 (D.D.C. 2016) (finding variance appropriate where defendant was caretaker of daughter); *United States v. Khan*, No. 07-CR-623, 2010 WL 610534, at *1–2 (E.D.N.Y. Feb. 19, 2010) (imposing probationary sentence and varying from Guidelines where defendant was caretaker for family members); *United States v. Schaadt*, No. 1:10-CR-57-TLS, 2015 WL 3466225, at *1 (N.D. Ind. June 1, 2015) (granting variance "because he currently serves as a primary caretaker for his elderly mother"); *see also United States v. Collins*, No. 1:18-cr-00567-VSB-2 at ECF 173 (S.D.N.Y. Feb. 5, 2020) (imposing probation, home confinement, and community service despite applicable Guidelines range of 37 to 46 months).  Mr. Gilder's family, parents, in-laws, neighbors, and the children that he coaches did not commit any wrongdoing, but they will certainly suffer if Mr. Gilder is sentenced to a custodial term.

## V.   **CONCLUSION**

For the foregoing reasons, Mr. Gilder respectfully requests that the Court impose a non-custodial sentence of either probation or home confinement, with appropriate terms and conditions.

Dated:  Los Angeles, California
        January 12, 2024

Respectfully submitted,

HALPERN MAY YBARRA GELBERG LLP

*/s/  Aaron M. May*

Aaron M. May, *Pro Hac Vice*
HALPERN MAY YBARRA GELBERG LLP
550 S. Hope Street, Suite 2330
Los Angeles, CA 90071
Telephone:  (213) 402-1900
Facsimile:  (213) 402-1901
Aaron.may@halpernmay.com

*Attorney for Defendant Brian Gilder*